## PENDER v. LEVINE.

District Court, S. D. New York.
July 10, 1930.

Shaine & Weinrib, of New York City (Edward C. Weinrib, of New York City, of counsel), for plaintiff.

H. & J. J. Lesser, of New York City (J. Lesser, of New York City, of counsel), for defendant.

KNOX, District Judge.

On November 7, 1928, a petition in bankruptcy was filed against Monarch Costume Corporation. Adjudication followed, and plaintiff was elected trustee of the bankrupt estate. Julia S. Levine, the defendant, is the wife of Max A. Levine, who was president of the bankrupt concern. In August of 1928 an indebtedness of $5,200, then owing to Mrs. Levine, was discharged. This was accomplished through the medium of three checks, as follows:

August 10, 1928...................$ 300
August 23, 1928................... 2,000
August 23, 1928...................2,900

In an effort to recover the foregoing payments upon the ground that they constituted voidable preferences, under section 60b of the Bankruptcy Act (11 USCA § 96(b), and that they are to be regarded as fraudulent transfers under section 15 of the Stock Corporation Law of the state of New York (Consol. Laws, c. 59), as it existed in August, 1928, the present suit was instituted.

The facts leading up to the bankruptcy were these: The corporation had but two stockholders, Levine, the president, and Gittleman, secretary and treasurer. The capital stock of $22,400 was equally divided between them. As of January 1, 1928, a financial statement was issued which showed assets of $38,152.16 and liabilities of $15,788.63. At this time the accounts receivable by the bankrupt amounted only to $6,249.33. They were, however, represented as being $11,249.33. The justification assigned for this increase is that a previous statement of the bankrupt's condition as of July 1, 1927, had shown a surplus of assets over liabilities of $22,018.-47, and, if the statement of January 1, 1928, had shown the shrinkage in this item which occurred in the intervening period, a bad impression would have been created in the minds of those from whom credit was to be obtained. In order, therefore, that the company should show no substantial impairment of capital, the accounts receivable were inflated to the extent of $5,000. At the same time, Max A. Levine and Gittleman agreed to pay the corporation an equal amount of cash, each obligating himself to contribute $2,500. Gittleman was unable to make his promise good, and Levine undertook to perform on Gittleman's behalf, as well as on his own. The transaction was this: Levine obtained the sum of $5,000 from his wife, and the money was paid to him in checks drawn to her order. The same were then indorsed, and on February 6, 1928, were deposited in the company's bank account. Thereupon entries on the books of the bankrupt were made which indicated that payments to the extent of $5,000 had been made on the accounts receivable. Meanwhile Gittleman executed his note for $2,500, indorsed by his wife to one of the Levines, and delivered the same. It remains unpaid.

The schedules in bankruptcy, as filed by the bankrupt, show liabilities of $20,418.25 and assets of $11,363.35, or an excess of liabilities over assets of $9,054.90. If this sum be added to the capital assets of $22,363.53, as of January 1, 1928, it is apparent that between the latter date and the occurrence of the bankruptcy the corporation sustained a loss of $31,418.43.

On December 31, 1927, Gittleman was indebted to the corporation in the sum of $1,779.22, representing withdrawals in excess of the stipulated salary to which he was entitled. This item was included as an asset in the financial statement of January 1, 1928. For the purpose of eliminating this indebtedness, an entry was placed upon the books of account which charged "labor" with $1,779.22. This was followed by a credit to Gittleman's account of an equal sum. To the end that Levine should not be prejudiced by the procedure, checks of the bankrupt totaling $1,779.22 were drawn to him as of March 31, 1928, and then indorsed and deposited in the bankrupt's bank account. An item of $40, covering interest on the amounts of the checks, was also credited to the account. The aggregate of these items was then set up as an indebtedness owing to the defendant. At the same time certain checks and cash produced by Levine in the sum of $2,140.78, plus an interest credit of $40, went into the bankrupt's bank account, and were set up as an indebtedness owing to Mrs. Levine. Thereafter Mrs. Levine advanced moneys as follows:

April 23, 1928.......................$750
April 25, 1928....................... 750
May 4, 1928......................... 750
May 7, 1928......................... 250

These advances, when added to the credits set up in favor of Mrs. Levine, as above shown, made her a creditor of the bankrupt concern as of May 7, 1928, to the extent of $7,250. Between June 9, 1928, and July 20, 1928, $2,050 of this indebtedness was paid. In August, 1928, checks aggregating $5,200 were drawn by the bankrupt to the order of the defendant, and deposited in her account by her husband, who at all times acted as her attorney in fact in financial matters. In passing, it is to be observed that defendant was absent from New York when these payments were made and was unaware of them until so informed by her husband at a subsequent date. As bearing upon the attention which Mrs. Levine gave to the whole matter, I quote from her testimony, which was refreshing in its frankness:

"Q. In the month of August there was deposited to your account by your husband under his power of attorney $5,200, representing the balance that was due to you at that time? A. Yes.

"Q. You knew about that, did you? A. Yes, I was not here but I knew about that.

"Q. As a matter of fact, before these payments were made to you, other payments had been made to you representing the other amounts owing to you, is that right? A. Yes, always.

"Q. Did you have any talk with your husband prior to your departure for Youngsville * * * in respect to this indebtedness of the Monarch Costume Corporation to you? A. No, I cannot say that I did.

"Q. Any reference at all to the indebtedness? A. No, my husband knew he owed it to me, and I might have said, 'when am I going to get my money' or something like that, and he probably made me feel easy about it, that is all. I went away. I was not in good health.

"Q. This money that you loaned was your money as I understand it? A. Yes, it was.

"Q. Did Mr. Levine talk with you or discuss the financial condition of Monarch Costume Corporation? A. No, I do not think he did. I do not think he thought I knew much about business. I never spoke to him, and when he asked me for money, I let him have it as I always had done, and I was always paid back.

"Q. Did he tell you at any time that business was poor or what? A. I cannot say that he did."

At the time the bankrupt issued the financial statement of January 1, 1928, it was indebted to Chatham-Phenix National Bank & Trust Company in the sum of $5,000. A similar amount was also owed to the State Bank. On August 16, 1928, a payment of $2,500, was made to the first named bank, and the balance of the debt renewed. Such balance, as well as the indebtedness owing to the State Bank, were discharged subsequent to the payment of the money due to Mrs. Levine.

With the foregoing recital in mind, something should be said relating to the business done by the bankrupt from the beginning of 1928 to the date of bankruptcy, in order to ascertain if, in August, 1928, the corporation was insolvent. Briefly, the business had not prospered. According to Levine, the loss between January and August, 1928, amounted to a little more than $10,000. He says, however, that he does not know if he had a loss in the latter month. But, be that as it may, the fact is that in August the corporation undertook to change the character of its business. The company gave up the manufacture of cheap cotton garments, in which it previously had been engaged, and began to produce silk dresses. Gittleman's version of this episode is as follows:

"We were not going ahead in business

and I suggested that we go into a better line. I had a talk with Mr. Levine. * * * He said he feels * * * discouraged in the business we had been doing * * * and so he thought that going into a new venture he had a little too much money. In other words, I did not have as much money in it as he had at that time so he thought 'I do not want to take a chance' and he said if I could put some more money in it that it would be all right, and I told him I did not have it which he knew I did not; and I suggested that if we started * * * if he goes over the figures, and if I still had sufficient money to try it with him, withdrawing his $5,000, that I could still go ahead. He went over the figures and he said that if he withdrew his money he would still have some money to do business with and that is how we started."

The company proceeded to purchase considerable quantities of merchandise, and made up a sample line of dresses, but for some reason or other they did not go well, and it was not long before merchandise was being sold at a loss, and the proceeds being used in part to pay the indebtedness of Mrs. Levine, together with the bank loans on which her husband and Gittleman were personally liable.

An attempt is made to excuse the failure of the new line of business by assertions that Gittleman, who was an experienced cutter and designer of women's garments, made mistakes in cutting up the piece goods; and that, in an attempt to skimp the dresses, he succeeded only in ruining a large number of them. These statements, nevertheless, have no corroboration from any person who is without interest in the present case, and are, I believe, not to be credited. It appears highly improbable that a man of Gittleman's experience should have jeopardized the value of all or a substantial portion of the raw material by embarking on large scale manufacture before he knew the result of his design and cutting.

Nevertheless, the explanation thus given, coupled with a financial statement which has been made up from the books as of the corporation as they stood on August 31, 1928, and which shows an apparent net worth of $5,847.08, are relied upon to defeat the plaintiff. This surplus of assets over liabilities exists only as a result of crediting the corporation with a merchandise inventory as of August 31, 1928, of $10,113.74.

One difficulty with the value so placed on whatever inventory the concern had on hand as of August 31, 1928, is that it has been reconstructed, not from book records, which show its existence on that date, but from bills showing receipt of goods in August, and the recollection of Levine as to stock then on hand, and which was thereafter sold, plus a labor charge amounting to $2,786.06. Another obstacle in the way of placing a value of as much as $10,000 on the inventory is that the sales of the bankrupt between August 31, 1928, and the date of bankruptcy were in the neighborhood of $13,000. This means that, if the inventory were worth $10,000, with a resultant surplus of assets over liabilities of approximately $5,000, the concern lost $15,000 in disposing of its stock in trade of the value of $13,000. Otherwise the liabilities at the time of failure would not have exceeded assets by $10,000. This mere statement of fact is sufficient to indicate the unreliability of the constructed inventory, and it follows that the value given it by defendant must be materially discounted. While it is impossible to fix upon the real value of the inventory, my conclusion is that it was not sufficiently large to cause either Levine or Gittleman honestly to believe that the corporation had a reasonable chance to survive, or that it would continue. The handwriting on the wall had appeared, and it was being interpreted correctly. The assets of the company were being reduced to cash, and liabilities in which there was personal interest was being liquidated, as against the day of inevitable failure, which ultimately came.

Taking into consideration all that has been set forth, I have slight hesitancy in holding the bankrupt was insolvent at the time the August checks, aggregating $5,200, were deposited in the bank account of the defendant, and that it was the intention of the corporation to prefer her over other creditors of the same class. Had there been a bona fide intention to continue in business, the company would not have depleted its cash resources at the very time that it needed funds to start the new line of business on which it embarked. The losses between January and August, 1928, in my opinion, must have gone far beyond the sum of $10,000 estimated by Levine. By his admission, he understands the theory of bookkeeping and had charge of the company's finances. That he was unaware of the way things were going, and honestly believed the company to be solvent at the time of the contested payments, is more than I can credit. My conclusion is that the company was insolvent and known to Levine to be so. What, then, of the knowledge of the preference on

the part of Mrs. Levine? That she had any actual personal knowledge of the true situation is improbable. She impressed me as a truthful witness, and I think she left matters entirely to her husband, and did as he suggested. But Mrs. Levine had constituted her husband as her agent in financial matters, having to do with the bankrupt. He held her power of attorney and acted for her as and when, as well as in any matter, he chose. His knowledge as to the preferences he intended to create, and his purpose to give his wife the benefit of them, must, under the circumstances here present, be imputed to the defendant. See Floore v. Moore (C. C. A.) 294 F. 680; Clarke v. Rogers, 228 U. S. 534, 33 S. Ct. 587, 57 L. Ed. 953. As the preferences were created within four months of the date of the bankruptcy, the case comes within 60b of the act.

In view of my findings and conclusions, it is unnecessary to make a determination of plaintiff's rights under section 15 of the Stock Corporation Law of this state.